NOT FOR FULL-TEXT PUBLICATION
File Name: 10a0343n.06
No. 08-6471

FILED

**Jun 07, 2010**

LEONARD GREEN, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

DAMEON THOMAS,

        Defendant-Appellant.

_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

BEFORE:  MARTIN, SUHRHEINRICH, and WHITE, Circuit Judges.

        **SUHRHEINRICH, Circuit Judge.**  Defendant Daemon Thomas ("Thomas") raises various challenges to his conviction and sentence following his jury conviction.  We AFFIRM.

### I.  Background

        On September 29, 2005, Officer Adam Lenz ("Lenz") of the Columbia Police Department ("CPD") in Maury County, Tennessee, approached a parked Hummer H2 vehicle in the parking lot of the Shadybrook Mall in Columbia, Tennessee, for allegedly playing loud music in violation of a Tennessee excessive noise ordinance.  When Lenz approached the vehicle, he smelled marijuana. Defendant Daemon Thomas was sitting in the driver's seat.  The car was registered to Thomas's girlfriend, Tiffany Gardner ("Gardner").  As Lenz waited for backup to arrive, Thomas handed him a bag of marijuana.  Detective Andre Martin ("Martin") searched the vehicle.  He discovered a loaded Taurus .40 caliber pistol hidden underneath the driver's side passenger seat.  The gun later

turned out to be stolen. When asked to whom the gun belonged, Thomas responded that the gun was his. Martin also found approximately 54 rounds of various brands of .40 caliber ammunition.

Thomas was arrested for unlawful possession of a weapon. While being transported to the Maury County jail, Thomas told the transporting officer, Officer Jason Sanders, that he was supposed to meet a federal agent as part of a gang-prevention program and stated that he had the gun because he was having problems with former gang members. At this point, Sanders administered *Miranda* warnings to Thomas. Thomas voluntarily completed a gun arrest questionnaire. On the questionnaire, Thomas indicated that he had the gun for protection, that he bought it off the streets, and that he had other firearms.

Thomas was indicted on one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). On July 18, 2007, a superseding indictment added three new charges: possessing ammunition after a felony conviction, in violation of 18 U.S.C. §§ 922(g) and 924; possessing a stolen firearm which was transported in interstate commerce, in violation of 18 U.S.C. §§ 2 and 922(j); and unlawfully, knowingly, and intentionally possessing a quantity of marijuana, in violation of 21 U.S.C. § 844(a).

Thomas filed a motion to suppress, claiming that Lenz lacked a legitimate basis to stop him for violation of the excessive noise ordinance, and because of that, the firearm, his two confessions, and the gun arrest questionnaire must be suppressed. Thomas further alleged that his incriminating statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). After an evidentiary hearing, the district court denied the motion, and all three admissions were introduced at trial. The jury convicted on all four counts. At sentencing, the district court deemed Thomas an armed career criminal within the meaning of 18 U.S.C. § 924(e) based on his three prior felony

convictions. Although his guideline range was 210 to 260 months, the district court sentenced Thomas to 180 months in prison on Counts 1 and 2; 120 months on Count 3; and 13 months on Count 4, all to run concurrently.

## II. Analysis

On appeal, Thomas raises five issues. First, he claims that Lenz lacked cause to stop him because two youths who parked beside him were the source of the loud music. Second, he argues that Martin violated his *Miranda* rights when Martin asked to whom the gun belonged. Third, Thomas argues that Sanders violated his *Miranda* rights when he asked Thomas questions in the patrol car prior to administering *Miranda* warnings. Fourth, Thomas claims there was insufficient evidence that the firearm belonged to him. Fifth, he argues that the 1991 robberies were all one criminal episode and not distinct acts under 18 U.S.C. § 924(e) because the robberies occurred in close geographic and temporal proximity.

## A. The Stop

Thomas claims that Lenz had neither probable cause nor reasonable suspicion to believe that Thomas had violated Tennessee's noise ordinance when he stopped Thomas's vehicle. He argues that Lenz had no legal basis to stop his attempt to leave the parking lot because he turned his music down as soon as he saw Lenz, and two juveniles were the source of the music. Alternatively, Thomas asserts that Lenz could not rely on an uncorroborated tip of the two youths.

When reviewing the denial of a motion to suppress, this court reviews a district court's findings of fact for clear error and its legal conclusions de novo. *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004) (quotation marks and citations omitted). Credibility assessments are entitled to deference "inasmuch as the court was in the best position to make such a determination."

*United States v. Garrido*, 467 F.3d 971, 977 (6th Cir. 2006) (internal quotation marks and citation omitted). We review the evidence in the light most favorable to the government. *United States v. Torres-Ramos,* 536 F.3d 542, 549 (6th Cir.), *cert. denied*, 129 S. Ct. 772 (2008).

It is well-settled that law enforcement may briefly detain an individual for investigation if the officer has a reasonable suspicion that a crime has been committed. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994). Lenz had reasonable suspicion to conduct a *Terry* stop in this case because Thomas was violating a Tennessee statute banning loud music. The relevant statute provides that "[n]o person operating or occupying a motor vehicle on any . . . parking lot . . . shall operate . . . any sound amplification system, including, but not limited to, any radio, . . . from within the motor vehicle so that the sound is plainly audible at a distance of fifty (50) or more feet from the vehicle." Tenn. Code Ann. § 55-8-193(a) (2006). Lenz testified that he heard Thomas's music during the entire time that he was preparing an investigation report, approximately fifteen to twenty minutes before he approached Thomas's car. The district court did not err in crediting Lenz's testimony. Thomas presented a different version of events, claiming that the two juveniles pulled up alongside him and were the source of the music. But as the district court noted, Thomas's story supported Lenz's account. The district court's credibility assessment is entitled to special deference.

Thomas also argues that he lowered his music as soon as the youths pulled up and before Lenz arrived at his vehicle. Even if this were true, Lenz was not obligated to discontinue his investigation because, by that point, Lenz had reasonable suspicion that the ordinance had been violated. And even if Lenz mistakenly assumed Thomas was the source of the music, the mistake of fact justified the vehicle stop, because, as noted above, the conduct violated a Tennessee statute.

-4-

*See, e.g., United States v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814 (6th Cir. 1999) (noting that a "mistaken premise can justify *Terry* stop if an officer acted reasonably upon it"; citation omitted). In any event, the district court credited Lenz's testimony over Thomas's, and upon review of the record we cannot say that this finding was clearly erroneous.

Thomas also alleges that Lenz ordered him to halt while he was attempting to leave the parking lot. Lenz did not provide a similar account. In any event, as the district court held, given that Lenz already had reasonable suspicion to believe Thomas had violated the excessive noise ordinance, Thomas's attempt to avoid him would be an additional factor in the reasonable suspicion calculus. *See generally United States v. Keith*, 559 F.3d 499, 504-05 (6th Cir. 2009) (stating that factors that appear innocent standing alone may in combination support a finding of reasonable suspicion, including evasive behavior by a suspect; discussing cases). In other words, when he allegedly stopped Thomas from exiting, Lenz already had a "particularized and objective basis for suspecting" that Thomas had violated the ordinance and was "aware of specific and articulable facts which [gave] rise to reasonable suspicion." *Id.* at 503 (internal citations omitted).

In addition, the district court credited Lenz's testimony that as he approached Thomas's vehicle, he smelled marijuana. This factor also supported reasonable suspicion for a *Terry* stop.

Thomas argues that Lenz lacked reasonable suspicion because he relied on the uncorroborated tip of the two juveniles. Although Thomas correctly asserts that an uncorroborated tip from a confidential or anonymous source cannot provide the basis for probable cause, that was not the case here. Lenz had first-hand knowledge that Thomas was playing loud music in violation of the excessive noise ordinance. Thus, the information the youths provided merely corroborated what Lenz had already observed. For this reason, the cases that Thomas cites are inapposite.

In short, Lenz had reasonable suspicion to conduct a *Terry* stop.

## B. First Gun Statement

Thomas asserts that he was in custody when he made the statement to Martin that the gun was his. He argues that the statement should have been suppressed because he had not yet been *Mirandized*. Specifically, he claims that he was already in custody because, after Lenz detected the marijuana odor emanating from the vehicle, Lenz told Gardner and Thomas to exit the vehicle and separated them in order to get more information for the citation from Thomas. Thomas claims that Martin's statement, "Well, that changes things, buddy," marks the point in time when the nature of the stop changed from investigative detention to an arrest, especially since the officers knew Thomas was a convicted felon. Moreover, although Martin directed his question regarding the gun to both, as Lenz had stated, Gardner and Thomas were separated. Finally, he claims the earlier reference to "buddy" was clearly directed to him.

The Fifth Amendment states that a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda*, the Supreme Court held that a suspect subject to custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination. *Miranda,* 384 U.S. 436. To ensure compliance with this rule, incriminating statements elicited during custodial interrogation prior to *Miranda* warnings cannot be admitted at trial. *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam).

However, this rule only applies "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). The Supreme Court has defined "custodial interrogation" as "questioning initiated by law

enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 494.

In determining whether a suspect is in custodial interrogation, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason*, 429 U.S. at 495). This court also considers the following factors:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998).

Thomas argues that he was "in custody" when Martin stated "Well, that changes things, buddy", and then asked the question "Whose gun is this?" without first giving a *Miranda* warning. At the suppression hearing, Lenz stated that he did not take Thomas into custody until Thomas claimed that the weapon was his. Thomas testified that, when Martin found the gun, Martin told Sanders and Lenz to detain Thomas, but that the two officers hesitated to handcuff him because he had been so cooperative. Thomas then stated: "So they asked me – the black detective asked, he said, is this your gun, looking at me. And I was like, yes, sir, that's my gun. And he just shot on, started doing paperwork, told them to detain me." So Thomas's own testimony establishes that

Thomas was not handcuffed until he made the statement.[1] Thus, the question becomes whether he was merely under investigative detention or was actually in custody prior to being handcuffed, and when he made the incriminating statement.

We agree with the district court's determination that Thomas was not under arrest. First and foremost, for the reasons discussed above, Thomas was the subject of a lawful *Terry* stop. Thomas's contention that he did not feel free to leave is immaterial. "The very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003) (citing *Berkemer*, 468 U.S. at 439-41). In other words, during a *Terry* stop, "[t]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* (internal quotation marks and citation omitted). Further, "[a]lthough the 'felt free to leave' inquiry may be factor for consideration . . . the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 531 (internal quotation marks and citations omitted).

Prior to the time he was handcuffed and placed in the patrol car, Thomas was not physically restrained. In fact, while in the car, he leaned over the seats and grabbed the marijuana baggie. Although required to exit the car, he and Gardner walked freely to the back of the vehicle.

As the district court also found, only one brief question was asked, and the purpose of the question was to determine who owned the firearm. Because possession of a firearm is not

---

[1]Even if he had been handcuffed, this fact would not automatically convert the detention to an arrest. *See, e.g., United States v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999) (stating that "the use of handcuffs [does not] exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution").

necessarily a crime, the question was merely investigatory. And, as the district court also found, the place of questioning was neither hostile nor coercive. The questioning took place outside, in a public space, with several onlookers passing by. *See Berkemer*, 468 U.S. at 442 (stating that a single police officer's questions to detainee and request that detainee perform a simple balancing test in a location visible to passing motorists was not the functional equivalent of a formal arrest). As the district court held, the video showed a pleasant discussion between Gardner, Thomas, and the officers while the investigation was taking place.

More importantly, Thomas himself testified that he volunteered the answer. He specifically stated that he "stepped up for the pistol" because he was worried about Gardner's job and custody of her children. In sum, when viewed in totality, it is clear that Thomas was merely subject to investigative detention at the time that he answered Martin's question and therefore was not yet entitled to *Miranda* warnings. The district court did not err in denying the motion to suppress.

In any event, a careful review of the video reveals that Thomas was asked whether he had any prior felony convictions *before* the "buddy" statement was made. As noted, the video does not capture Martin's question about ownership. However, as the Government argues, it is plausible that Martin found the gun, the officers asked Thomas about his prior convictions, and then one of them made the "buddy" comment. This sequence of events would explain why the officers asked Thomas about his criminal history, because Thomas *had already admitted the gun was his*. Again, though, the "buddy" statement does not undermine the district court's finding that when Martin asked the gun question, the environment was not coercive and that Thomas himself volunteered the statement.

### C. Second Gun Statement

Thomas also argues that his incriminating statement to Sanders while en route to the Maury County jail should have been suppressed because he made it in response to a question posed by Sanders and before Sanders *Mirandized* him. The Government responds that Thomas's argument is "both a factual and legal nullity" because Sanders's question was not designed to elicit any kind of incriminating response and had nothing to do with a firearm. Furthermore, Thomas's answer was non-responsive to the question and was therefore a volunteered confession. Finally, the Government claims that Sanders *Mirandized* Thomas as soon as he realized that Thomas would continue to incriminate himself.

Thomas testified at the suppression hearing that, during the arrest and transport to jail, Sanders asked Thomas what he was doing with the gun, why he had tattoos on his face, and why he had the gun. The video shows that, while being transported, Thomas asked Sanders how long it would take for Thomas to be bonded out of jail. Sanders explained that "it's a simple possession charge," but that "the only thing that might mess things up is your parole." Thomas then asked: "What about the gun?" Sanders responded: "The gun. I mean you're a convicted felon. You're not supposed to have gun. I'm not exactly sure what penalty that carries. My advice to you is basically, if you don't have a lawyer you need to get one." Thomas asked again: "So what's it take someone to make bond?" Sanders replied that "it depended on how busy the jail was, whether a magistrate was present." Sanders added that "it depends on whether you've got cash for bond." There was silence approximately thirty seconds. Then Sanders asked Thomas: "You got somewhere . . . talking about time, you got somewhere you need to be?" In response, Thomas explained: "Yeah. You're not gonna believe this. I have a meeting with the feds, a gang awareness, a gang prevention program. That's why I got the gun. I knew I couldn't buy it in a store so I bought it off the streets." Sanders

said "Right." Thomas reiterated that was why he bought the gun. At this point, Sanders stopped Thomas, and told him that he needed to advise Thomas of his rights. Sanders then administered the *Miranda* warnings.

*Miranda* warnings are necessary only during "interrogation." *Miranda*, 384 U.S. at 444. "Custodial interrogation" is "questioning initiated by law enforcement officers." *Id.* "Interrogation" in the *Miranda* context has a special meaning:

> "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.
>
> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980) (footnotes omitted). In determining whether a defendant has been interrogated, a court should "carefully scrutinize the factual setting of each encounter." *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir. 1983). "Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *Id.*

On the other hand, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Innis*, 446 U.S. at 299-300 (quoting *Miranda*, 384 U.S. at 478). That is, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478.

-11-

In *Innis*, the defendant was arrested for robbery. *Innis*, 446 U.S. at 293-94. The police were unable to locate the gun used to commit the crime. *Id.* at 294-95. One of the officers mentioned to another officer while in the defendant's presence that there were a lot of handicapped children in the area who might hurt themselves if they found a weapon. *Id.* The defendant then offered to show the officers where he had hidden the gun. *Id.* at 295. The Supreme Court held that the officers' conversation was not "interrogation" because there was "no express questioning," the "entire conversation appear[ed] to have consisted of no more than a few off hand remarks," rather than a "lengthy harangue in the presence of the suspect," and the record "in no way suggest[ed] that the officers' remarks were *designed* to elicit a response." *Id*. at 302-03 & n.9.

Similarly, in this case, there was "no express questioning" but a simple off-topic question following up on Thomas's conversation about timing issues, and nothing in the record shows that Sanders was trying to elicit an incriminating response. Instead, the video reflects that Sanders was not interrogating Thomas, but rather that the two were engaged in casual conversation. The district court did not err in concluding that Sanders did not "initiate" questioning because the question he asked was not designed to elicit an incriminating response.

Although the defendant in *Innis* had been *Mirandized,* and the conversation in that case occurred between the two police officers and was not directed at the suspect, these factual differences are not so significant as to require a different result in this case. *See United States v. Hurst*, 228 F.3d 751, 760 (6th Cir. 2000) (holding that an officer's comment that "we've got good information on you," did not contain "any compulsive element suggesting a Fifth Amendment violation under the circumstances"); *see also Fleming v. Metrish*, 556 F.3d 520, 527 (6th Cir.) (holding that officer's "brief remarks" to defendant that he "needed to do the right thing" and asking

-12-

whether he "now wished to talk to the lead investigating officer" were not a "lengthy harangue" amounting to a constitutional violation and thus analogous to facts of both *Innis* and *Hurst*), *cert. denied*, 130 S. Ct. 103 (2009). Because Sanders was not attempting to elicit information from Thomas, his question was not the "functional equivalent" of express questioning within the meaning of *Innis*. *See Tolliver v. Sheets*, 594 F.3d 900, 919 (6th Cir. 2010). Nor was Sanders required to stop Thomas midstream. "Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning." *Id.* at 920. Sanders simply asked a follow-up question. *Cf. id.* (holding that officer's question whether there was "more than one gun in the place" was a permissible follow-up question because it was in response to the suspect's volunteered statement that he "was getting the other gun out"). And "[p]olice may even interrupt a volunteered statement to ask clarifying or follow-up questions." *Id.*

In sum, as the district court held, there was no *Miranda* violation, so the statement was properly admitted. Even if the statement was obtained in violation of *Miranda*, its admission in this case is harmless, given Thomas's first statement and his responses on the gun questionnaire.[2] *See, e.g., Kyger v. Carlton*, 146 F.3d 374, 382-83 (6th Cir. 1998) (holding that the admission of a statement obtained in violation of *Miranda* resulted in harmless error because the defendant repeated the substance of the statement in a later admissible statement).

### D. Sufficiency of Evidence

Thomas contends that the evidence was insufficient to find him guilty of owning or possessing a weapon, and as a result, he should have been acquitted of the three counts pertaining to possession of a weapon and ammunition. In reviewing the sufficiency of the evidence, the

---

[2]Thomas does not challenge the admission of the questionnaire on appeal.

relevant inquiry is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In doing so, we do not weigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

Here, the Government was required to prove beyond a reasonable doubt that: (1) Thomas had a prior conviction for a crime punishable by imprisonment for a term exceeding one year; (2) Thomas thereafter knowingly possessed the firearm and ammunition specified in the indictment; and (3) the possession was in or affecting interstate commerce. *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003). To obtain a conviction under § 922(j) for possession of a stolen weapon, the Government also had to prove knowing possession of a stolen weapon.

Thomas challenges only the element of possession of a firearm.[3] He claims that the evidence established that Gardner was the owner of the gun because: (1) the weapon was found in a vehicle owned by Gardner; (2) he testified that Gardner told him she purchased the gun; (3) Gardner also told Agent Welch and Attorney Small that the weapon was hers; and (4) Gardner admitted at trial that she told Welch that she was under no pressure to claim the weapon as her own. Further, Matrice Thomas ("Matrice") testified that Gardner admitted to her on two occasions that the gun was hers, and threatened to send Thomas to jail by falsely stating that the gun belonged to Thomas. Tillman's testimony supported the latter contention. Finally, Thomas explained at trial that he only "stepped up" to claim the gun in order to protect Gardner.

_____

[3]He does not present any arguments regarding his possession of ammunition or marijuana.

On the other hand, the jury also heard testimony that Thomas declared ownership of the gun three times: (1) in response to Martin's question, whose gun is this; (2) while in Sanders's patrol car being transported to jail; and (3) in the gun questionnaire. The last two confessions were contained on video and in writing respectively. The jury watched the video and had an opportunity to examine the gun questionnaire. In the gun questionnaire, Thomas provided details about the gun as well, stating that he "bought if off the streets"; it was a .40 caliber PT 140; and it took .40 caliber slugs. Moreover, Lenz testified that he saw Thomas reaching back in the area where the gun was found.

Thomas's argument on appeal essentially asks us to weigh the credibility of various witnesses. That is not our role. And, in any event, the jury had ample reason to reject Thomas's version of events. As a factual matter, Gardner testified that she never told Welch that the gun was hers. Instead, she told Welch that she did not know anything about the gun. Gardner also testified that Thomas consistently pressured her to "take the charges for the gun" after he learned that federal charges would be imposed. Gardner's testimony is consistent with Thomas's testimony that he would never have claimed ownership had he known he would face federal charges.

Matrice contradicted herself. At trial, she testified that Thomas told her about the gun prior to Gardner's phone calls. When asked why her trial testimony was inconsistent with her testimony at a bond revocation hearing to the effect that Thomas never told her about the gun, Matrice explained that she had more time to think about her trial testimony.

In the end, the jury was presented with Thomas's "consistently inconsistent testimony." Thomas testified that Gardner told him she had purchased the gun after she saw Lenz taking the accident report in the mall parking lot. In explaining why he confessed to ownership of the gun

while being transported to jail, Thomas stated that he made the statement because Gardner was following him in her car. In explaining his discussion with Sanders on the way to the jail about the gun, Thomas admitted that he "made up" all of the story about getting the gun for protection. When asked about the questionnaire, Thomas testified that other than the phrase "loud music," "Jason Sanders, CPD," and his printed name, the handwriting was his. When asked why he admitted in the questionnaire that he owned other guns, Thomas stated: "I had already admitted to one gun. I didn't have any other guns, so what could it hurt, you know." During cross-examination, when confronted with his suppression hearing testimony that the information on the gun questionnaire form was not his handwriting, that only the signature and printing of his name were his, he said, "I was smoking weed, come up here too, and, as I said, I was stuck on that not being my handwriting, and I really didn't pay attention. I noticed the signature, and that's when I answered the question." He also variously stated that he and Gardner never talked about the gun until after his arrest. Still later, he testified that Gardner told him, "I have got a gun in this car." He stated he did not know that the gun was stolen until after his arrest. Shortly thereafter he testified that Gardner told him that she bought the gun off the street as they were pulling up to the mall. This latter contention, of course, was consistent with his statement on the ride to the jail that he bought it off the streets because he could not buy one in a store.

As this brief recitation reflects, Thomas's trial testimony was riddled with inconsistencies and contradictions. That the jury chose to believe the officers over Thomas's varying accounts is not surprising. In any event, it is beyond doubt that a rational trier of fact could have found him guilty beyond a reasonable doubt of possessing a stolen firearm and ammunition.

## E. Armed Career Criminal Status

Lastly, Thomas argued that he was not an armed career criminal within the meaning of 18 U.S.C. § 924(e), because three of his underlying convictions for robbery occurred on the same occasion. All four of the robberies occurred on December 13, 1991, at the same address in Memphis, Tennessee. Thomas stated that his motive in the several robberies was "to have enough money to go out and have fun."

According to police reports, the first robbery took place at about 11:30 p.m. Thomas, armed with a gun, approached JoJo Rockett at 1349 Autumn, asked for directions, demanded money, and then robbed her. Thomas then ran to the corner, escaping on foot, and met two other individuals[4]. At approximately 11:35 p.m., Thomas, armed approached Gregory Taylor, at 1349 Autumn. After robbing Taylor, Thomas ran to the corner, escaping on foot, and met two other individuals. Five minutes later, at 11:40 p.m., Thomas robbed Vicki Lawson and Tim Patterson, at gunpoint, at 1349 Autumn. He escaped on foot, ran to the corner, and met two other individuals. Approximately three hours later, at 2:30 a.m., Thomas and his accomplices drove Thomas's mother's car to a parking lot at 1625 Popular, in Memphis, Tennessee. Thomas and one accomplice approached Lauren Shaw and Brian Webb, who were seated in their car. Thomas's accomplice pointed a gun at Shaw, demanded money, and fired into the car, striking Webb's leg. Thomas and the shooter fled on foot to their car and drove off.

---

[4]At the hearing, Thomas denied running to the corner between robberies. He admitted instead to "hiding in between cars waiting for people to go by." The district court at least partially credited Thomas's account, stating, "[s]o the only evidence that there is and the only thing that makes sense is that after the robbery, he retreated somewhere, probably in between the cars, according to his testimony today, and waited for someone else to walk by that was another possible victim who might have money and then robbed someone else and still didn't get enough and so either ran away or ducked between cars, or whatever, and waited for the next person to come along."

The district court held that Thomas's four predicate felonies were separate for purposes of the ACCA because there were different victims, Thomas had time to change his mind between crimes, and Thomas either ran to the corner or ducked between cars after each robbery. On appeal Thomas argues that his four separate robbery convictions in 1991 constituted one continuous episode because the robberies occurred in close temporal and physical proximity. He argues the first three offenses were really part of the same course of conduct because all took place within a ten-minute period, at the same location, and, as the district court found, all were motivated by the same desire.

Under the ACCA, a criminal defendant convicted of violating 18 U.S.C. § 922(g), is subject to a mandatory minimum sentence of fifteen years if he has three prior convictions "for a violent felony or serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e).[5] We review the district court's decision that the crimes were committed on "occasions different from one another" de novo. *United States v. Hill*, 440 F.3d 292, 295 (6th Cir. 2006) (internal quotation marks and citation omitted).

This court has held that "there are at least three indicia that offenses are separate from each other" under the ACCA. *Id*. at 297. First, the felonies are separate "if it is possible to discern the point at which the first offense is completed and the subsequent point at which the second offense begins." Second, two offenses are separate if "it would have been possible for the offender to cease his criminal conduct after the first offense, and withdraw without committing the second offense."

---

[5]The term "violent felony" includes crimes that have as an element the use or threatened use of physical force against another person. 18 U.S.C. § 924(e)(2)(B). Thomas does not dispute that the prior convictions meet this definition.

-18-

Third, "separate offenses are committed if the offenses are committed in different residences or business locations." *Id.* at 297-98.

Thomas's actions satisfy the indicia of separate offenses. Although the robberies were committed in close temporal and geographic proximity, Thomas was charged with, and pled guilty to, robbing separate victims. Thomas could have ended his crime spree after completing any one of these offenses. Thomas did not rob a group of people, on one block, simultaneously. Rather, he robbed several individuals and escaped or retreated on foot after each robbery. Although he returned to the same location for the first three robberies, the record reflects and the district court found as a matter of fact that he left the scene, albeit briefly, between each of the robberies, making a conscious decision to return and rob a different victim. The fact that the first three robberies were committed within minutes of each other at the same address is not dispositive here. Thomas committed four distinct acts with defined beginnings and ends, he had a chance to cease his conduct after each criminal act before carrying out the next criminal act, and he chose different victims. Thus, as the district court held, his four convictions on the night of December 13-14, 1991, were offenses "committed on occasions different from one another" for purposes of holding that Thomas was an armed career criminal under the ACCA, and pursuant to this court's reading of that statute. *See United States v. Brady*, 988 F.2d 664, 674 (6th Cir. 1993) (en banc) (Jones, J., dissenting) (remarking that under the majority view, "[a]ny lapse at all even for a minimal amount of time, will hurtle the defendant into the clutches of the ACCA").

*Brady*, is, as the Government suggests, directly analogous. There, the defendant committed two armed robberies, first a beauty shop, and then a bar, within thirty minutes of each other. *Id.* at 666. The defendant argued the two robberies should count as only one offense under the ACCA

because they were part of a continuous crime spree. *Id.* The en banc court rejected the defendant's argument, holding that "offenses committed by a defendant at different times and places and against different victims, although committed within less than an hour of each other, are separate and distinct criminal episodes and that convictions for those crimes should be counted as separate predicate convictions under § 924(e)(1)." *Id.* at 669. The *Brady* court noted that while the defendant waited at the bar with his concealed weapon, "he could have decided that the one robbery he had committed was enough for the evening. Instead, he decided to rob again." *Id.*; *see also Hill*, 440 F.3d at 294, 298 (concluding that two burglaries of two businesses across the street from one another, which occurred consecutively, were separate offenses).

Like the defendant in *Brady*, Thomas had some amount of time between robberies to decide to commit the next crime. The fact that he returned to the same place does not negate the fact that distinct, not simultaneous, acts of robbery occurred.

*United States v. Wilson*, 27 F.3d 1126 (6th Cir. 1994), also is analogous. There, the defendant was convicted of two criminal sexual conduct offenses on the same date and in the same house, but against separate victims and on different floors. *Id.* at 1131. This court affirmed the district court's holding that his offenses were separate for purposes of § 924(e), noting that while the defendant "could have halted his criminal rampage at any time[], he chose to continue selecting different victims in separate places." *Id.*

Thomas basically did the same thing here. Each time he fled the scene at 1349 Autumn, he could have chosen to cease his criminal conduct, but instead he returned to rob different victims. A recent unpublished decision also supports the conclusion that the crimes in this case occurred on separate occasions for purposes of the ACCA. *See United States v. Keith*, 281 F. App'x 542 (6th

-20-

Cir.), *cert. denied*, 129 S. Ct. 586 (2008). There, the district court found that the defendant qualified for the enhancement under the ACCA based on robbery convictions of three different people at 10:45 p.m., 11:00 p.m., and 11:15 p.m., on February 9, 1998, in Akron, Ohio. *Id.* at 543. We affirmed, finding that "[e]ach robbery had a discernable point of completion, Keith could have stopped between each robbery, and each robbery took place at a different location." *Id.* at 544. Thus, all three indicia of separate offenses of the ACCA were present. *Id.*

Thomas relies on *United States v. Murphy*, 107 F.3d 1199 (6th Cir. 1997); *United States v. Graves*, 60 F.3d 1183 (6th Cir. 1995); and *United States v. Thomas*, 211 F.3d 316 (6th Cir. 2000). In *Murphy*, the defendant and two accomplices robbed the occupant of the first residence of a duplex. While the accomplices robbed the adjoining residence of that structure, the defendant remained in the first residence to prevent the occupant from calling the police. *Murphy*, 107 F.3d at 1208. This court held the two robberies constituted one single predicate offense under the ACCA because the defendant had not completed the first offense before the second offense. This was because the defendant had "never left his original location, he never ceased his original conduct and he never successfully escaped the site of the first crime until the second was complete." *Id.* at 1210. In *Graves*, the defendant burglarized a home, fled into the nearby woods, and shot at a pursuing police officer. *Graves*, 60 F.3d at 1187. Noting that *Brady* had "considered whether or not the defendant safely escaped from one crime scene before he committed the second crime," the *Graves* court held that the defendant's offenses constituted a single criminal episode under the ACCA because the assault on the officer was within moments of the burglary and the defendant had not left the location of the burglary when he committed the assault. *Id.* at 1186-87. In *Thomas*, the defendant and his accomplice took control of a vehicle and both repeatedly raped and beat the driver and her passenger.

*Thomas*, 211 F.3d at 318. This court found that the sexual assaults began when the defendant entered the vehicle and did not end until both men had exited the vehicle. *Id.* at 321. The *Thomas* court concluded that the defendant's two convictions for rape were not separate occasions for purposes of the ACCA. *Id.*

All three cases are distinguishable. In contrast with *Murphy* and *Graves*, in this case, the district court found that Thomas left the location of each robbery and escaped after each one. Unlike the defendant in *Thomas*, Thomas and his defendants did not exercise control over the robbery victims all at once. The crux of the analysis here is that Thomas "left the site of the first robbery" before returning to commit a second robbery, and again "left the site of the second robbery" before returning to commit the third. That he returned to the same spot is immaterial - - the key is that he made a conscious decision to end the first crime, as reflected by his flight, and then another conscious decision to begin a new crime by returning to 1349 Autumn. *Cf. United States v. Washington*, 898 F.2d 439, 442 (5th Cir. 1990) (two robberies at exact same location treated as separate criminal episodes where the defendant "committed the first, completed it, and escaped; then after a few hours of no criminal activity, [the defendant] returned to commit the second crime.")

In sum, the district court did not err in sentencing Thomas under 18 U.S.C. § 924(e) based on the four convictions for aggravated robbery.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.