RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0300p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

SAMANTHA BACHYNSKI,

*Petitioner-Appellee,*

No. 15-1442

*v.*

ANTHONY STEWART, Warden,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-13762—David M. Lawson, District Judge.

Argued: December 9, 2015

Decided and Filed: December 23, 2015

Before: SUTTON and KETHLEDGE, Circuit Judges; BECKWITH, District Judge.[*]

───────────────

**COUNSEL**

**ARGUED:** John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Marilena David-Martin, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** John S. Pallas, Elizabeth Rivard, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Marilena David-Martin, Valerie R. Newman, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellee.

───────────────

[*]The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

———————————————

**OPINION**

———————————————

SUTTON, Circuit Judge.   When Michigan police officers arrested Samantha Bachynski on suspicion of murder, she invoked her right to remain silent and asked for an attorney.   During later interactions between the officers and Bachynski, she changed her mind, eventually pointing to a detective and saying:   "I want to talk to you."   She then waived her *Miranda* rights three times and confessed three times to a slew of crimes, including murder.   A jury convicted her, and the state courts upheld the conviction over her Fifth (and Fourteenth) Amendment challenge to her confession.   A federal district court granted her petition for a writ of habeas corpus, holding that the detectives impermissibly interrogated her without an attorney present.   Because the state courts reasonably construed the Supreme Court's teachings in this area, we must reverse.

I.

According to the state appellate court, here is what happened.   Bachynski's first two victims were Scott Berels and his pregnant wife Melissa.   Bachynski and her boyfriend, Patrick Selepak, an acquaintance of Melissa, came to the Berels' house.   At some point, they locked the couple in their bathroom.   Then Selepak choked Melissa until she was blue but still alive, all within earshot of her restrained husband.   Bachynski "finish[ed] it," pulling a belt around Melissa's neck until she was dead.   *People v. Bachynski*, No. 281550, 2009 WL 723600, at *2 (Mich. Ct. App. Mar. 19, 2009).   Bachynski took a break to smoke a cigarette, then returned to Scott.   Selepak beat Scott "until there was blood everywhere," and Bachynski "moved a knife across [his] neck" and injected him with bleach.   *Id.*   Bachynski put her foot on Scott's head and pulled a belt around his neck, killing Scott.   Bachynski took another cigarette break.   She and Selepak hid the bodies before stealing the couple's money and driving away in their car.

The next day, they befriended a stranger, Frederick Johnson, at a dance club, and they seduced him later that night and in the days that followed—at a hotel and eventually at Johnson's house.   They also spent time with him eating and shopping in Frankenmuth, Michigan.   They returned to the dance club with him and his son-in-law the next day.   And they spent the next two

days after that watching movies at Johnson's house. On the last night, they tortured and killed Johnson, apparently in order to steal his truck and other personal items. They loaded his dead body in the bed of Johnson's truck and stole the truck. Police eventually found Bachynski and Selepak in the dead man's stolen truck, with the dead body in the back. They were arrested.

The police read Bachynski her *Miranda* rights, and she requested an attorney. They did not ask her any questions. Two detectives from another jurisdiction, Charles Esser and Kenneth Stevens, arrived at the police station about an hour later and reread Bachynski her *Miranda* rights. She again said she wanted an attorney. The conversation ended, and Bachynski was sent back to her cell.

About thirty minutes later, Esser and Stevens realized that Bachynski had no "tools to get a hold of her attorney." *Id.* at *9. They went to Bachynski's cell and asked her if "she had been given an opportunity to use a phone to contact her attorney." *Id.* I don't have one, Bachynski responded. Stevens offered her a phone to call her family and a phone book to find an attorney. At this point, Bachynski said that she didn't want to spend the rest of her life in prison and wondered whether she needed an attorney. Esser reiterated that "they could not discuss anything further with her until her attorney was present." *Id.* Bachynski responded, "with some urgency in her voice": "I can change my mind, can't I?" R. 9-5 at 80. Pointing at Detective Stevens, she said: "I want to talk to you." *Id.*; *see also Bachynski*, 2009 WL 723600, at *9. The detectives obtained the approval of the prosecutor to continue speaking to Bachynski before taking her to another room.

The detectives read Bachynski her *Miranda* rights and asked her whether she wanted to talk to them without an attorney present. Bachynski "reiterated that she wanted to talk" to them. *Bachynski*, 2009 WL 723600, at *9. Acknowledging that she had initially requested an attorney, she said she had "changed [her] mind," "asked to" talk with Detective Stevens, and "would rather just talk to [the detectives]" than get an attorney. R. 9-22 at 6. She signed a waiver of her *Miranda* rights and confessed to the crimes. *Bachynski*, 2009 WL 723600, at *3, *9.

About six hours later, Bachynski asked to speak with the officers who had arrested her. The officers administered another *Miranda* waiver, and Bachynski again confessed to the murders. She did the same thing a third time, this time to Detective Stevens.

Bachynski came to regret her confessions.  Her attorney moved to suppress them, arguing that the detectives had "coerce[d]" her into talking through "psychological intimidation."  R. 9-5 at 101.  As Bachynski remembers the events in her cell, the detectives not only offered her a phone to call her attorney but also mentioned that Selepak had waived his *Miranda* rights and was talking with other officers about the case and that Selepak's accomplice in a previous case got in more trouble by not talking.  All of these statements, her attorney argued, convinced Bachynski to talk and amounted to an improper interrogation.

The state trial court denied Bachynski's motion, making no mention of Bachynski's testimony.  It found that Bachynski had initiated the interrogation, not the other way around, and for that reason rejected her claim.

At trial, the jury heard the confessions and observed physical evidence that incriminated Bachynski:  her fingerprints were on the duct tape used to wrap the bodies; her sweatshirt had bleach and blood on it; and she was in the driver's seat of a dead man's truck with his dead body in the back when she and her boyfriend were arrested.  The jury rejected Bachynski's defense that her boyfriend made her do it and found her guilty of two counts of first-degree murder, among other crimes.  The court sentenced her to life without parole.

On direct appeal, Bachynski challenged the admission of her confession, claiming it violated her rights to counsel and against self-incrimination.  *Bachynski*, 2009 WL 723600, at *9–10.  The Michigan Court of Appeals disagreed.  It held that the detectives' "communication with [Bachynski] in her holding cell was not an interrogation or the functional equivalent of an interrogation" because it "solely" involved helping her acquire an attorney.  *Id.* at *10.  Bachynski, not the detectives, was the one who "insisted on speaking" about the case.  *Id.*  At that point, the court held, Bachynski "voluntarily, knowingly and intelligently waived her rights."  *Id.* at *9–10.  The Michigan Supreme Court denied discretionary review, and Bachynski did not seek review in the U.S. Supreme Court.

Bachynski filed a petition for a writ of habeas corpus in federal court, alleging many defects in her conviction.  The district court granted relief on one claim—that the state courts unreasonably admitted her confessions in violation of her Fifth Amendment rights—and rejected the others.  The State appealed.

II.

Our standard of review is familiar.  Federal courts may not disturb a state court's merits decision with respect to a conviction unless it is "contrary to" or an "unreasonable application of" clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d)(1).  In this instance, the Supreme Court has not "confront[ed] the specific question presented by this case."  *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (per curiam) (quotation omitted).  That means Bachynski must rely on the unreasonable-application prong of § 2254(d)(1).  *See id.*  To prevail, Bachynski must show that the state courts' determination was "so lacking in justification that [it] was an error . . . beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).  That is not an easy standard to meet.  The detectives' conduct must have been so obviously an interrogation that no reasonable judge would think otherwise. It was not.

After a suspect invokes her right to counsel, police may not initiate an "interrogation" of the suspect without counsel present.  *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). An interrogation occurs when the police "should have known" that their conduct was "reasonably likely to elicit an incriminating response."  *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980).  That definition naturally includes "express questioning" designed to ferret out the suspect's involvement in the case.  *Id.* at 300–01.  But it also includes the "functional equivalent" of such questioning—"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Id.* at 301.  If a reasonable person, using all of the facts and circumstances available, would view the police as attempting to obtain a response to use at trial, it is an "interrogation."  *See id.* at 300–02 & n.5.

At the same time, suspects who invoke their *Miranda* rights remain free to change their minds.  When the suspect initiates a case-related discussion, "the right to have a lawyer present can be waived."  *Wyrick v. Fields*, 459 U.S. 42, 46 (1982) (per curiam).  And the police remain free to converse with the suspect about "routine incidents of the custodial relationship."  *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality op.); *see Pennsylvania v. Muniz*, 496 U.S.

582, 603–04 (1990).  The police may not, however, "approach[] [the suspect] for further interrogation." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

All of this means that, after a suspect invokes her right to counsel, courts may still admit a subsequent confession if (1) the suspect, as opposed to the officers, initiates the interrogation with the police and (2) the suspect waives her right to counsel.  *Smith v. Illinois*, 469 U.S. 91, 94–95 (1984) (per curiam).  The state courts reasonably held that Bachynski did both.

*Did the officers interrogate Bachynski after she invoked her right to counsel but before she said, "I want to talk to you"?*  After Bachynski invoked her right to counsel, the police never expressly interrogated her.  Bachynski instead claims that they made comments to her that amounted to the functional equivalent of an interrogation.  None did.

Bachynski first claims that the detectives initiated an "interrogation" when they returned to her cell to provide her the tools to get an attorney:  a phone and a phone book.  But all of this facilitated the exercise of the right to counsel, not an interrogation.  When a suspect invokes her right to counsel, there is nothing wrong with getting her an attorney or getting her the tools to hire one.  The idea that offering a suspect a phone and phone book to call an attorney is somehow a ruse to convince her to do just the opposite—to waive the right she has just invoked—is a heavy lift.  The offer facilitates the exercise of the right; it does not subtly or directly undermine it or for that matter amount to a prompt to waive it.  The officers had no reason to think she would say something incriminating or reconsider her invocation of counsel when they made this offer.  We have previously reached this precise conclusion.  An officer's questions "principally aimed at finding [the suspect] an attorney," we held, did not constitute an "interrogation." *United States v. Ware*, 338 F.3d 476, 481 (6th Cir. 2003).  That's all there is to it—at least to this contention.

Bachynski's second contention is more complicated.  She claims that, before she said "I want to talk to you," the detectives told her that:  (a) Selepak was talking with other officers about the case, and (b) Selepak's brother, his accomplice in a previous case, got in more trouble by remaining silent.  But that's not what the state courts found.  Their opinions never mention Selepak or his brother in this context, instead finding that the detectives' questions focused "solely" on getting Bachynski an attorney, *see Bachynski*, 2009 WL 723600, at *9–10, and that

the detectives "scrupulously honored" Bachynski's rights, *see* R. 9-5 at 105; *see also id.* at 54, 73. We presume those findings are correct, and must uphold them if any evidence supports them, which it does. *See* 28 U.S.C. § 2254(e)(1); *Rice v. Collins*, 546 U.S. 333, 341–42 (2006); *cf. White v. Wheeler*, No. 14-1372, 2015 WL 8546240, at *3–4 (U.S. Dec. 14, 2015) (per curiam).

The most Bachynski can do to rebut these findings is to note that the state appellate court cited a case that held that "informing the accused that a codefendant has given a statement" does not violate the Constitution. *Bachynski*, 2009 WL 723600, at *10 (citing *People v. Kowalski*, 584 N.W.2d 613, 617–18 (Mich. Ct. App. 1998) (per curiam)). That citation, she says, amounts to a finding of fact by the state court that the statement occurred in this case. But case citations are not fact findings. State courts do not make fact findings through passing references to legal decisions, least of all when it comes to facts that bear on the underlying inquiry. The statements that Bachynski alleges the officers made, but that they deny, cannot be found anywhere in the state courts' opinions. All that exists in the state court opinions on this score is language denying the existence of these alleged additional statements—namely, that the detectives' questions focused "solely" on getting Bachynski an attorney, *see Bachynski*, 2009 WL 723600, at *9–10, and that the detectives "scrupulously honored" Bachynski's rights, *see* R. 9-5 at 105. One cannot accept Bachynski's version of events without contradicting these state court findings. As a federal habeas court constrained to give the state courts "the benefit of the doubt," we must accept the state court's record-supported fact findings. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

Even if we accepted Bachynski's theory, even in other words if we agreed that the state court's citation to *Kowalski* imported the relevant facts from that case into this one, only one of the detectives' two alleged comments would be affected. The cited case dealt only with "inform[ing] [the] defendant that [the] codefendant . . . had given a statement," *Kowalski*, 584 N.W.2d at 615; it did not involve implied threats of the sort that Bachynski says occurred when the detectives allegedly commented about Selepak's brother. If we add the one statement to the mix (that Selepak was talking), the state courts still could reasonably conclude that no

interrogation took place. Fairminded jurists could disagree about whether informing a suspect that an accomplice is talking constitutes an "interrogation."

Our court already has said as much. *Shaneberger v. Jones* held that, where a detective "informed [the suspect] that he had been implicated by a co-defendant," the state courts reasonably concluded that no interrogation had taken place. 615 F.3d 448, 454 (6th Cir. 2010). Because the detective "directed [the suspect] not to respond" to his comment, and because the suspect chose to speak to a different officer at a different time, the detective's statement reasonably fell "outside the realm of interrogation." *Id.* A like conclusion applies here. As Bachynski acknowledges, *see* Appellee's Br. 5, Detective Esser directed Bachynski "not to respond" to him. *Shaneberger*, 615 F.3d at 454; *see Bachynski*, 2009 WL 723600, at *9. Bachynski instead asked to speak with different officers later in time. And Bachynski admitted that no one talked to her about her case before she brought it up. What was reasonable there is reasonable here.

*Innis*, the leading case on the meaning of "interrogation," supports this conclusion. In point of fact, it seems to present the harder fact pattern, and it arose on direct review to boot. Even a conversation between officers in front of the suspect about what might happen if the wrong person found the murder weapon, the Court held, was not an interrogation about the location of the gun. 446 U.S. at 303. The Court acknowledged the "subtle compulsion" inherent in these kinds of conversations and the compulsion inherent in the nature of custody. *Id.* at 300, 303. But it held that no interrogation had occurred because "the entire conversation," far from being a "lengthy harangue," "consisted of no more than a few off hand remarks" that were not particularly "evocative." *Id.* at 303. If the Court found no interrogation there on *direct* review, it follows that no interrogation occurred here—or at least that it was reasonable to think it did not—on *habeas* review.

Our habeas caselaw points in the same direction. In *Fleming v. Metrish*, the habeas petitioner claimed that he was "interrogated" by police officers after requesting counsel. 556 F.3d 520, 525 (6th Cir. 2009). The officers told the suspect that "things did not look good for him" and that he should "do the right thing" by getting "with the program." *Id.* at 522. The officers even asked the suspect if he had changed his mind about talking and informed him

that they had found the murder weapon in his home. Only then did the suspect waive his *Miranda* rights and confess. The state courts nevertheless held that the officers' pre-waiver conduct did not violate the Fifth Amendment. We upheld that determination, concluding that the officers' "brief remarks" did not constitute "an interrogation within the meaning of *Miranda*." *Id.* at 527. If telling a suspect that "things did not look good for him" and that he should "do the right thing" did not clearly violate federal law, then neither does talking with Bachynski about Selepak.

Other Sixth Circuit cases are of a piece. An officer's comment to a suspect that "we've got good information on you" did not constitute an "interrogation," even on direct review. *United States v. Hurst*, 228 F.3d 751, 760 (6th Cir. 2000). It "contain[ed] no compulsive element suggesting a Fifth Amendment violation." *Id.* Neither did a "casual conversation" about acquiring an attorney. *United States v. Thomas*, 381 F. App'x 495, 501–03 (6th Cir. 2010). Ditto for an officer's comment that "things would be easier for [you] if [you] talked." *United States v. Murphy*, 107 F.3d 1199, 1205 (6th Cir. 1997). The same goes for a comment that the officer "knew that [the suspect] possibly had the weapon." *Hart v. Steward*, No. 14-5446, 2015 WL 4567590, at *6 (6th Cir. July 30, 2015). And for one that you "could possibly face the death penalty" for your crime. *McKinney v. Ludwick*, 649 F.3d 484, 489–90 (6th Cir. 2011). That is not all. *Id.* at 491–92 (collecting more similar cases). Nor is our circuit alone in reaching this conclusion in similar settings. *E.g.*, *United States v. Blake*, 571 F.3d 331, 336 (4th Cir. 2009). In the face of these precedents, it is difficult to conclude that it is *obviously* unconstitutional to say to a suspect who has invoked her right to counsel that a co-suspect is talking.

One other principle favors this conclusion. The more general the constitutional rule, the more leeway the state courts have to implement it. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). At issue, we can all agree, is a "general rule." *Dickerson v. United States*, 530 U.S. 428, 441 (2000); *Van Hook v. Anderson*, 488 F.3d 411, 417–18 (6th Cir. 2007) (en banc). The nature of this general inquiry—should a police officer "have known" that his conduct was "reasonably likely to elicit an incriminating response"?—permits a range of reasonable answers in a range of facts and circumstances. All of this makes it "less likely a state court's application of the rule will be unreasonable." *Desai v. Booker*, 732 F.3d 628, 631 (6th Cir. 2013). Each of these

factors considered, the state courts' answer in this instance fell well within the "range of reasonable applications of the standard." *Bedford v. Bobby*, 645 F.3d 372, 378 (6th Cir. 2011) (per curiam).

*Was Bachynski's waiver of her right to counsel valid?* Yes. Although post-invocation waivers are presumed invalid, *see McNeil*, 501 U.S. at 177, ample evidence rebutted that presumption here and showed that Bachynski voluntarily and knowingly waived her *Miranda* rights. *Bachynski*, 2009 WL 723600, at *10; R. 9-5 at 105–06; *see Garner v. Mitchell*, 557 F.3d 257, 260–61 (6th Cir. 2009) (en banc). Before any "interrogation" took place, she reviewed her rights (for the third time), both orally and on paper. She said she understood all of them, and she signed a document to that effect. She did not have any questions or appear to misunderstand what was happening. She did not equivocate in her desire to talk to the police or in her resolve that she had changed her mind about wanting to speak to an attorney. She later signed two more waivers, never second guessing her desire to talk with the police. Nor was she impermissibly "badgered" even though the detectives reread her the *Miranda* warnings after she initially refused to talk. *See* Appellee's Br. 31. We have allowed far more such warnings in the past. *See Davie v. Mitchell*, 547 F.3d 297, 303–06 & n.1 (6th Cir. 2008).

The district court relied on one case apiece from the Second and Third Circuits to reach the opposite conclusion. One problem with that explanation is that circuit precedent (even our own) "does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" and a court may not grant habeas relief based on lower-court precedents alone. *See Glebe v. Frost*, 135 S. Ct. 429, 431 (2014). The other problem is that the two cases are not helpful on their own terms. Both cases pre-date AEDPA, which increased the requirements for overturning state court criminal convictions. The police conduct at issue in the cases also was more extreme than the conduct at issue here because in one the police asked the suspect to "give us a statement," *United States v. Szymaniak*, 934 F.2d 434, 437 (2d Cir. 1991), and in the other the police used one suspect to confront the other, *Nelson v. Fulcomer*, 911 F.2d 928, 934 (3d Cir. 1990). For many of these same reasons, *Shaneberger* refused to rely on these cases in a situation like ours. 615 F.3d at 453–54. We do the same here.

III.

There is another, independent reason for rejecting Bachynski's claims. Any state court error was harmless. Although confessions typically have a "profound" and "dramatic effect on the course of a trial," *Arizona v. Fulminante*, 499 U.S. 279, 296, 312 (1991), this was not a typical case. Given the overwhelming evidence against Bachynski, the admission of the confessions did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quotation omitted). We thus have no warrant to disturb the state court conviction on habeas review. *See Davis v. Ayala*, 135 S. Ct. 2187, 2197–99 (2015); *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007); *see also Humphreys v. Gibson*, 261 F.3d 1016, 1025 (10th Cir. 2001).

The jury heard and saw ample other evidence of Bachynski's guilt, evidence that she concedes was admissible. The jury knew that: Bachynski helped Selepak with previous crimes; she was at the victims' house the night of the murders; she bought duct tape near the house after the murders; her fingerprints were on the used duct tape on the dead bodies; her fingerprints were on the lockbox found in the trunk of one of the stolen cars; the sweatshirt she wore the night of the murders had bleach and blood on it; she lied to her family about her whereabouts; she told a friend that she needed to change her appearance after the murders; and she was in the driver's seat of a dead man's truck with the dead body in the back at the time of her arrest.

All of this evidence would have forced Bachynski to present the same defense that she presented with the confessions: that her boyfriend made her do it. That was her story from the beginning and according to her remained "pretty much the same" at trial, R. 9-14 at 38. Bachynski claimed that Selepak had implicitly and explicitly threatened her to go along with the murders, by, for example, pointing a gun at her. That, she said, negated her intent to commit the murders. On appeal, notably, Bachynski does not argue that, without the confessions, she would have defended her participation in the murders differently.

The jury rejected this defense, and the confessions offered no meaningful basis for changing its calculus in doing so. With or without the confessions, the jury would have been confronted with the choice of believing Bachynski's excuse or rejecting it. Either way, the prosecutor would have asked, "why didn't she [leave]" when she had the chance? R. 9-15 at 18.

Either way, the evidence would have come out that she was not unduly influenced by Selepak but in fact seemed in control at several points during the relevant time period. The evidence still would have shown that Bachynski played an active role in previous crimes. It still would have shown that at 3:30 a.m., immediately after the murders, Bachynski went to a nearby CVS by herself to purchase duct tape to wrap the bodies, not appearing "under distress at all" but instead appearing quite "calm." R. 9-7 at 63. It still would have shown Bachynski partying after the murders while in control of the stolen money and other goods. And it still would have shown that she was in the driver's seat of a stolen truck, with a dead body—and the guns purportedly used to threaten her—wrapped neatly in the back. All of this means that, with or without the confessions, the jury still would have found Bachynski guilty.

For these reasons, we reverse.