RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————————

DANIEL LEE BEDFORD,

        *Petitioner-Appellee,*

    *v.*

DAVID BOBBY, Warden,

        *Respondent-Appellant.*

No. 11-3526

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 11-00311—Algenon L. Marbley, District Judge.

Decided and Filed: May 16, 2011

Before: BOGGS, SUTTON and McKEAGUE, Circuit Judges.

———————————————

## COUNSEL

**ON BRIEF:** Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Carol A. Wright, Erin G. Barnhart, FEDERAL PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee.

———————————————

## OPINION

———————————————

PER CURIAM. Daniel Lee Bedford is scheduled to be executed tomorrow, May 17, 2011. Earlier today, the district court granted Bedford's motion for a stay (filed last Friday) to give Bedford additional time to prove that he is incompetent to be executed, *see Ford v. Wainwright*, 477 U.S. 399 (1986), and additional time to obtain review of the state trial court's *Ford* ruling against him. We grant the State's motion to vacate the district court's stay for two reasons: Bedford waited too long to file his *Ford* claim, and he has no chance of success on the merits of his claim.

1

I.

In 1984, twenty-seven years ago, an Ohio jury convicted Bedford of murder and aggravated murder, and the trial court, on the jury's recommendation, imposed a sentence of death.  The state courts rejected his direct appeals and post-conviction petition, *see State v. Bedford*, 529 N.E.2d 913 (Ohio 1988); *State v. Bedford*, No. C-099412, 1991 Ohio App. LEXIS 4252 (Ct. App. Sept. 11, 1991), and we rejected his petition for federal habeas relief in 2009, *see Bedford v. Collins*, 567 F.3d 225 (6th Cir. 2009).  The Supreme Court denied certiorari early last year. *Bedford v. Collins*, __ U.S. __, 130 S. Ct. 2344 (2010).

On April 22, 2010, almost thirteen months ago, the State asked the Ohio Supreme Court to set Bedford's execution date.  Bedford filed a memorandum in opposition, claiming that mental incompetence prevented him from assisting his counsel in clemency proceedings.  Bedford asked the Court to dismiss the State's motion to set an execution date or hold it in abeyance for at least six months.  Meanwhile, in August 2010, Bedford filed a second post-conviction petition asserting an *Atkins* claim, arguing he was mentally retarded when he committed the offense and therefore was ineligible for the death penalty.  *See State v. Bedford*, No. C-100735, 2011 WL 1642311, ¶ 3 (Ohio Ct. App. Apr. 29, 2011) (per curiam).  The state appellate courts rejected his *Atkins* claim on timeliness grounds.  *Id.*; *Ohio v. Bedford*, __ N.E.2d __, 2011-Ohio-0741 (Ohio May 10, 2011) (Table).

On February 8, 2011, the Ohio Supreme Court rejected his effort to delay the setting of an execution date, scheduling the execution for May 17, 2011.

For three months, Bedford did not file any pleadings in state or federal court.  On May 9, 2011, one week ago, Bedford filed a notice in state court under Ohio Rev. Code Ann. § 2949.28, which provides a procedure by which death-row inmates may raise challenges to their competence to be executed under *Ford*.  That same day, he filed a motion for a stay of execution with the Ohio Supreme Court.  On May 11, the Ohio Supreme Court denied his motion for a stay.  On May 13, the state trial court dismissed his claim, explaining that there was "no probable cause to believe that [Bedford] is

insane under R.C. 2949.28(A)," App'x 33, and declined to hold an evidentiary hearing. Bedford appealed to the state intermediate appeals court on May 13 and filed a second motion for a stay with the Ohio Supreme Court. Earlier today, on May 16, after the Ohio Supreme Court denied his second motion for a stay, the state intermediate appellate court rejected his appeal. Bedford immediately appealed the state appellate court's ruling and renewed his motion for a stay in the Ohio Supreme Court. The Ohio Supreme Court declined to exercise jurisdiction over the appeal and denied his motion for a stay pending appeal. *State v. Bedford*, __ N.E.2d __, 2011-Ohio-2355 (Ohio May 16, 2011) (Table).

Meanwhile, on May 13, last Friday, Bedford filed a petition for habeas corpus in federal district court, raising a *Ford* claim and arguing that Ohio's competency procedures denied him due process of law. Bedford also requested that the district court stay his execution to allow the state courts more time to address his claims. At 4:00 pm today, the district court issued an opinion granting the motion for a stay. The State filed a notice of appeal and a motion to vacate the stay.

## II.

When a "habeas corpus proceeding is pending," federal courts have the authority to stay an execution under 28 U.S.C. § 2251. We generally apply a four-factor test in deciding whether to grant a stay: "1) whether there is a likelihood he will succeed on the merits of the appeal; 2) whether there is a likelihood he will suffer irreparable harm absent a stay; 3) whether the stay will cause substantial harm to others; and 4) whether the injunction would serve the public interest." *Workman v. Bell*, 484 F.3d 837, 839 (6th Cir. 2007).

"A stay is an equitable remedy, and equity must take into consideration the State's strong interest in proceeding with its judgment." *Nelson v. Campbell*, 541 U.S. 637, 649 (2004). "[T]here is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Id.* at 650. "[T]he last-minute nature of an application to stay execution" bears on the propriety of granting relief. *Gomez v. U.S. Dist. Court for N. Dist. of Cal.*, 503 U.S. 653, 654 (1992) (per curiam). We review the

district court's decision to grant a stay for an abuse of discretion.  *See Workman v. Bredesen*, 486 F.3d 896, 904–05 (6th Cir. 2007).  "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard."  *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004).

III.

A.

Bedford's first problem is that he waited far too long to bring this claim.  Over the last eighteen months, Bedford has had several opportunities to seek relief in the state and federal courts on his *Ford* claim.  He neglected every one of them—until seven days ago.

In December 2009, he was interviewed by Dr. Doninger, the lead psychologist in support of his *Ford* claim.  Yet he did not file a *Ford* claim.

On April 22, 2010, after the United States Supreme Court denied his petition for a writ of certiorari, *Bedford*, 130 S. Ct. 2344, the State moved to set an execution date.  He opposed the motion on the ground that his mental incompetence prohibited him from assisting counsel in his clemency proceeding.  Yet he did not file a *Ford* claim.

One week later, on April 30, 2010, Dr. Doninger prepared an affidavit attesting to Bedford's mental deterioration and memory loss.  The affidavit indicated that Bedford could not recall the specifics of the offense and had significant impairments.  Yet he did not file a *Ford* claim.

In May 2010, Bedford filed a motion to oppose the State's request to set an execution date, arguing that Bedford had "significant impairments in the areas of his memory functioning, communicative abilities, comprehension skills, and reasoning abilities."  App'x 45.  Yet he did not file a *Ford* claim.

In August 2010, Bedford filed an *Atkins* claim in state court, arguing he was mentally retarded and was not eligible for the death penalty. Yet he did not file a *Ford* claim.

In December 2010, the other psychologist testifying on behalf of Bedford, Dr. Woods, interviewed Bedford. Yet Bedford did not file a *Ford* claim.

On February 8, 2011, the Ohio Supreme Court set his execution date for May 17, 2011. Yet he did not file a *Ford* claim.

In March 2011, Dr. Woods wrote a letter to the parole board about Bedford's incompetency, noting that his memory and adaptive skills were severely impaired and that he was intellectually disabled. Yet Bedford did not file a *Ford* claim.

On May 9, 2011, three months after the Ohio Supreme Court set an execution date and eight days before his execution, Bedford filed a *Ford* claim in state court.

The district court to its credit recognized that "undue delay" bears on whether to grant a stay in this case. D. Ct. Op. at 5. Yet its reasons for excusing the delay, with all due respect, are not convincing—and one of them no longer applies.

That a *Ford* claim does not become ripe until an execution is imminent offers no excuse for waiting to raise the claim for the first time in any court—state or federal—until eight days before the execution date. There is nothing in Bedford's medical history or in any of the affidavits that would provide a cognizable basis for justifying this delay—such as a recent medical incident that exacerbated his condition or a recent examination showing that what had once been a modest mental infirmity had suddenly become a more serious one. And a frequent prerequisite to obtaining relief on the claim—a hearing in which the trial court hears evidence about the issue—is positively undermined by waiting until the eleventh hour and nearly the fifty-ninth minute for bringing the claim. Indeed, it is puzzling to maintain that the state courts' *Ford* procedure violates due process while simultaneously giving the state courts just eight days to handle the claim (with no explanation for imposing such a timetable).

That Bedford was evaluated in September 2009, December 2009 and December 2010 does not show that he exercised "due diligence" in bringing this claim. D. Ct. Op. at 5. If anything, it cuts the other way. The delay from the latest of these evaluations (December 2010) until eight days before the May 17 execution date is nowhere mentioned or explained in the district court's opinion. Nor does the district court cite any evidence explaining what examination changed the diagnosis, if indeed a change ever occurred, from an issue of initial mental infirmity to *Ford*-level incompetence.

That Bedford was pursuing relief through clemency during the last several months also is of no moment. The two forms of relief are not mutually exclusive. And the only reason we can fathom why an inmate facing an execution date would pursue just one of these avenues of relief during the several months before his scheduled execution does not help Bedford.

That the Ohio statute for implementing *Ford* has no time requirement does not help Bedford either. The absence of a limitations period is just as it should be given the nature of a *Ford* claim. But merely because an inmate might be able to provide a reason for filing an eleventh-hour *Ford* claim does not mean that Bedford has any such reason. He does not.

That a *Ford* claim is not treated as a successive petition does not automatically entitle Bedford to a stay. In arguing to the contrary, Bedford invokes *Lonchar v. Thomas*, 517 U.S. 314 (1996), but that decision involved a general claim for first federal habeas relief, which this claim assuredly is not.

That Bedford is seeking a stay "not necessarily for a ruling on the merits of his *Ford* claim . . . but for time to return to the state courts to complete his appeal" from the state trial court's ruling against his *Ford* claim, D. Ct. Op. at 6, also does not help him. The state courts, including both state appellate courts, have now rejected Bedford's *Ford* claim on the merits. No doubt, the state trial court's ruling was "summary," *id*., and so too perhaps were the rulings of the two state appellate courts. But that takes us back to the central point: Bedford has offered no cognizable reason for waiting to bring this claim in state court seven days ago and in federal court just three days ago. On this

ground alone, the motion for a stay should have been denied, and the district court abused its discretion in concluding otherwise.

B.

The second problem with Bedford's claim is that he has no chance of success on the merits, and that too by itself suffices to vacate the district court's stay order as an abuse of discretion. *See Workman*, 486 F.3d at 911. The Antiterrorism and Effective Death Penalty Act (AEDPA), as the district court seemed to agree, *see* D. Ct. Op. at 6, 9, governs our review of Bedford's petition for habeas corpus. Under AEDPA, we may grant the writ with respect to claims "adjudicated on the merits in State court proceedings" only if the state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The state trial court adjudicated Bedford's claims on the merits, and the state appellate courts have refused to overturn that decision.

The *Ford* claim arises under the Eighth (and Fourteenth) Amendment, and at least in one sense is clearly established: "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." *Ford*, 477 U.S. at 409–10; *see Panetti v. Quarterman*, 551 U.S. 930, 949, 957 (2007). "Once a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949. Bedford believes the state courts misapplied these principles and that we should stay his execution to enable further consideration of two claims: (1) that the state court unreasonably applied federal law when it concluded he did not make a "substantial showing" of incompetence and denied him a full evidentiary hearing, and (2) that the State's competency procedures denied him due process of law.

The state courts reasonably rejected Bedford's first claim. In the context of an inmate's competence to be executed, the inquiry is whether the prisoner can rationally understand "the reasons for his punishment" or "whether he is unaware of why he is to suffer it." *Panetti*, 551 U.S. at 959. The Court has yet to "set forth a precise standard for competency," *id.* at 957, though "a psychotic disorder" would suffice, *id.* at 960. That "a concept like rational understanding is difficult to define," *id.* at 959, hurts Bedford's cause because it suggests a range of reasonable applications of the standard. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). That is Bedford's key problem on the merits.

The state courts reasonably decided that Bedford had not made "a substantial threshold showing" that he lacked a rational understanding of "the punishment [he is] about to suffer and why [he is] to suffer it." *Panetti*, 551 U.S. at 949, 957. Bedford has no documented *prior* history of a significant mental illness. And the evidence presented to the state courts at most suggests he does not recall a series of details about the murder or his life's history. Even without considering the State's contrary evidence, here are the highlights of what Bedford's experts have said:

Bedford's memory is severely impaired. Pet. 68.

[He] lacks intact memories of events and easily confuses memories he does have or that others attempt to remind him about. Pet. 74; *see* Pet. 13, 68.

In responding to inquiries about the perceived justice of his conviction, Mr. Bedford stated "guess if I said I did it, I did it." Pet. 14.

Bedford's condition has . . . deteriorated . . . with the onset of a dementia[-]form illness. Pet. 78. Bedford suffers from essential hypertension, the foundation for multi-infarct dementia. Pet. 79.

Bedford also meets the clinical definition of mental retardation (also termed intellectual disability). Pet. 79. [He has] significant limitations in intellectual functioning, Pet. 80, and significant limitations in adaptive functioning, Pet. 81.

> [He] is impaired on measures of . . . cognitive abilities that enable an individual to engage in appropriate, socially responsible, goal directed conduct and to modify behavior in response to environmental changes. Pet. 23.

> [P]rison officials . . . reported problems with . . . Bedford's speech and walking. Pet. 77.

Even on their own terms, the statements in these affidavits do not establish that Bedford does not understand the reasons for his conviction or the nature of his punishment, much less make it unreasonable to conclude to the contrary (as the state courts did). The Supreme Court has never held, much less suggested, that the failure to recall precise facts of an offense amounts to the kind of incompetence that prohibits the execution of a defendant. Were it otherwise, that would hardly help death-row inmates, as it would provide an incentive to carry out executions in fewer than 27 years after a murder.

There is also much to say for the state court's determination that Bedford did not make a "substantial" showing of incompetence. Consider other details in Bedford's psychologists' affidavits before the state court: Bedford could explain that if someone were "on death row, they killed somebody" and "offered shallow reasons for why there may be different levels of punishment for the same criminal act." Pet. 14. He even "suggested that different sentences may be handed down depending on the manner in which the victim was killed and their identity or relationship with the perpetrator." *Id.* He understood he had received the death penalty for killing Gwen Toepfert and a life sentence for killing John Smith. Pet. 15. Bedford also knew how the execution would be carried out (by lethal injection) and the consequences of the execution (he would die and, he hoped, wake up in a better place). Pet. 15–16. A state court could reasonably conclude that all of this establishes Bedford's "rational understanding of the State's reason for his execution." *Panetti*, 551 U.S. at 956.

In reaching a contrary conclusion, the district court relied on *Panetti*. But that decision hardly shows that the state courts acted unreasonably. Above all, neither party in *Panetti* disputed that Panetti *had made* a substantial threshold showing of

incompetence.  551 U.S. at 950.  Nor could they.  Panetti had been hospitalized numerous times for psychiatric disorders, including fragmented personality, delusions and hallucinations.  *Id.* at 936.  He had numerous psychotic episodes and became convinced the devil possessed his home.  *Id.*  Nothing of the sort is true here.  What explains *Panetti* is the reality that the court of appeals did not believe Panetti's delusions were relevant to his competence to be executed, which is what prompted the Supreme Court to step in.  Bedford has no similar indications of a comparatively serious mental defect.

The district court also thought that "[o]nce the paper record presented conflicts of fact and credibility, *Ford* and *Panetti* required an evidentiary hearing."  D. Ct. Op. at 9.  That is not true.  That different doctors reach different conclusions about an individual's mental health does not itself prove that *any one* of the doctors has shown a cognizable basis for granting a *Ford* hearing.

The district court questioned not only the substance of the state court's determinations but also its procedures.  The court thought that the state trial court's procedures were "questionable" because it based its ruling on a "paper review" of the expert reports.  D. Ct. Op. at 8.  But nothing about what the state court did was unreasonable under clearly established Supreme Court law.  Justice Powell's concurrence in *Ford*, which lays out the clearly established law for AEDPA purposes, *see Panetti*, 551 U.S. at 949, rejected a threshold determination that was "made *solely* on the basis of the examinations performed by state-appointed psychiatrists" where the defendant was "prevent[ed] . . . from offering contrary medical evidence."  477 U.S. at 424.  In this case, the state court considered Bedford's submissions in making its threshold determination.  As long as the state court "receive[d] evidence and argument from the prisoner's counsel," which the court did, it enjoys "substantial leeway to determine what process best balances the various interests at stake."  *Id.* at 427.  Contrary to the district court's reading, nothing in Justice Powell's concurrence requires a full hearing as part of a threshold determination of probable cause of insanity.  Otherwise, there would be no point in having a bifurcated process.

A claimant is entitled to additional procedures once he has made a "substantial" showing of insanity, *id.* at 426, not merely because he has shown a conflict in the record. The evidence presented by Bedford and the government at any rate does not present a stark contrast in facts but a disagreement about what legal conclusion to draw from the facts. The district court focused on the fact that the State's experts had not interviewed Bedford themselves. But this goes to show only that there was no factual conflict because the State's experts relied on Bedford's own evidence. And this takes the case further from *Ford* because the court did not rely "solely" on the State's experts, but if anything it relied mainly on Bedford's experts.

The district court also believed that a stay was appropriate on the ground that Bedford should be given a chance to complete review of his *Ford* claim in the state courts. But he now has had that chance, as the state courts have rejected all of these claims.

Precedent forecloses Bedford's other merits claim—that Ohio's *Ford* procedures fail to satisfy due process. *Ford* establishes that once a prisoner has made the requisite showing of incompetence, he is entitled to due process protections including a fair hearing. *Panetti*, 551 U.S. at 949. "This protection means a prisoner must be accorded an opportunity to be heard, though a constitutionally acceptable procedure may be far less formal than a trial." *Id.* Due process requires more than a determination based "*solely* on the . . . the examinations performed by state-appointed psychiatrists." *Ford*, 477 U.S. at 424 (Powell, J., concurring). Ohio's regime of requiring a prisoner to show probable cause of incompetence, we have already held, comports with the standards established in *Ford*. *See Scott v. Mitchell*, 250 F.3d 1011, 1014–15 (6th Cir. 2001). Ohio's procedures "afforded [Bedford] the basic fairness that *Ford* requires; namely the opportunity to be heard." *Id.* at 1014. In denying Bedford's claim, the state court "considered the pleadings of both parties," Pet. 126, and reasonably concluded Bedford had not made a substantial threshold showing of incompetence that would entitle him to additional process, *see Panetti*, 551 U.S. at 949.

IV.

For these reasons, we grant the State's motion to vacate the district court's stay of execution.