RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0199p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

STEPHEN HUGUELEY,

                              *Petitioner-Appellant*,

          *v.*                                                          No. 17-6024

TONY MAYS, Warden,

                              *Respondent-Appellee*.

───────────────

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 1:09-cv-01181—J. Daniel Breen, District Judge.

Decided and Filed:  July 1, 2020

Before:  BOGGS, GRIFFIN, and KETHLEDGE, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ON BRIEF:**  Amy D. Harwell, Dee R. Goolsby, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, Nashville, Tennessee, for Appellant.  Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

     BOGGS, Circuit Judge.  Stephen Lynn Hugueley, a death-row inmate at Tennessee's Riverbend Maximum Security Institution, appeals the denial of his 28 U.S.C. § 2254 habeas petition, which alleged various violations of his constitutional rights.  We granted a certificate of appealability on only one issue, whether Hugueley's counsel at trial was ineffective.  In the

proceedings below, the federal habeas court concluded that this claim had been procedurally defaulted. Hugueley originally raised the claim in his state post-conviction proceedings, but he waived the claim when he decided to voluntarily withdraw his petition. Hugueley now argues that he should have been declared incompetent to withdraw his post-conviction petition, and that the state-court procedures that determined that he was competent were procedurally deficient under *Panetti v. Quarterman*, 551 U.S. 930 (2007). He therefore contends that the court's ruling of procedural default was incorrect. In the alternative, he argues that his default should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012), because his state post-conviction counsel was ineffective, and her deficient performance caused his default.

For the following reasons, we reject Hugueley's arguments and affirm the district court's denial of his habeas petition.

## I. FACTUAL BACKGROUND

In 2003, Stephen Hugueley was convicted and sentenced to death for the January 17, 2002 killing of correctional counselor Delbert Steed at Tennessee's Hardeman County Correctional Facility. On the day of the murder, Hugueley, an inmate at the facility at the time, approached Steed from behind as he was sitting a table and began stabbing Steed with a homemade weapon fashioned out of a sharpened metal rod attached to a marker. Hugueley stabbed Steed thirty-six times and stopped only after the handle of his weapon broke off. Steed was carried out of the room with the sharpened portion of the weapon still embedded in him, and he died shortly thereafter. At trial, Hugueley testified that he had planned the attack on Steed because the victim "had a smart ass mouth," which was a "problem." *State v. Hugueley*, 185 S.W.3d 356, 366 (Tenn. 2006) ("*Hugueley I*"). Hugueley also admitted that had his homemade weapon not broken, he would have kept stabbing Steed, and that it was his intention to drive the weapon "plumb through and hit the concrete below him." *Id.* at 365.

The jury convicted Hugueley of first-degree murder. Hugueley then waived the presentation of any mitigating evidence during the penalty phase of the trial. However, the jury still considered several potential aggravating factors. In 1986, Hugueley was convicted of first-degree murder for killing his mother. In 1992, he was convicted again of first-degree murder

after killing a fellow inmate, James Shelton. In 1998, Hugueley was convicted of attempted first-degree murder after stabbing another inmate, Timerall Nelson. The jury sentenced Hugueley to death based on four aggravating factors: (1) he had several prior convictions for violent felonies; (2) the murder was especially heinous, atrocious, or cruel; (3) the murder was committed in a place of lawful confinement; and (4) the victim of the murder was a corrections employee. *See* Tenn. Code Ann. § 39-13-204(i)(2), (5), (8), (9); *Hugueley I*, 185 S.W.3d at 363. Following his conviction, Hugueley expressed a desire to waive his direct appeal, but since Tennessee law requires an automatic appeal from a death sentence, his direct appeal was heard by the Tennessee Court of Criminal Appeals and then by the Tennessee Supreme Court. Both courts affirmed his conviction and death sentence. *State v. Hugueley*, No. W2004-00057-CCA-R3-CD, 2005 WL 645179 (Tenn. Crim. App. Mar. 17, 2005); *Hugueley I*, 185 S.W.3d at 387.

## II. PROCEDURAL BACKGROUND

### A. State Post-Conviction Proceedings

On July 24, 2006, Hugueley filed a pro se petition for post-conviction relief as well as a pro se motion requesting that post-conviction counsel be appointed for him. Although the court appointed counsel to represent him, Hugueley later objected to the representation, and—in November 2006—notified the court that he wished to withdraw the petition. In January of 2007, Hugueley's appointed counsel, Kelly Gleason, filed an amended petition for post-conviction relief, which detailed thirty-one possible claims for relief, including a claim that Hugueley's trial counsel was ineffective for failing to request a competency hearing before trial and for permitting Hugueley to waive the presentation of mitigating evidence.

In a June 22, 2007 letter to the court, Hugueley reiterated his request to withdraw his post-conviction petition.[1] But at an August 2007 hearing, Gleason raised concerns about Hugueley's competency to withdraw his petition. In support, she provided the court with several

---

[1]In a series of letters sent to the court in the summer of 2007, Hugueley expressed that he had only filed his post-conviction petition to "stall" his execution because he learned that he might not be able to receive visitors while on "death watch"—a three-day period of increased supervision and security before an inmate's scheduled execution. He stated that he "had no intention of pursuing post-conviction until the end" and that after his visitation issues were resolved, he wished to withdraw his petition.

pieces of evidence that had been developed for Hugueley's trial, including a notebook detailing Hugueley's history of mental illness, and a social history and mitigation report that had been prepared for but—by Hugueley's choice—not submitted at trial. Gleason also submitted recent affidavits from two doctors who had evaluated Hugueley prior to trial. Although both doctors had originally declared him competent to stand trial, they both expressed the view that further evaluation of Hugueley's competency was warranted. Furthermore, Gleason filed motions for additional expert assistance, requesting funding for a neuropsychological expert, a psychopharmacology expert, and a psychiatrist. She also filed a motion requesting that funds be provided for a variety of brain-imaging scans. The court denied these requests.

However, after concluding that there was a genuine issue as to Hugueley's competency, the court directed Gleason and the state to each submit a list of mental-health experts who could evaluate Hugueley. On January 23, 2008, the court appointed Dr. John Hutson, an expert suggested by the state, and Dr. Peter Brown, an expert suggested by Gleason, for the evaluation. The court set a deadline of March 6, 2008 for their reports to be submitted. However, in a July 24, 2008 order, the court noted that Dr. Brown, after having received several extensions, had yet to evaluate Hugueley. The court also noted that Dr. Hutson had been mistakenly paid with funds from the Tennessee District Attorney General's Conference rather than with court funds; and although there were no indications of impropriety, the court concluded that it could not rely on Dr. Hutson's findings. The court thus disqualified both Dr. Brown and Dr. Hutson and directed the parties to submit a second list of experts who could evaluate Hugueley by August 25, 2008.

Tennessee submitted a new list of experts. Gleason also submitted a list of experts but noted that none of them would be able to complete the evaluation within the court's proposed timeframe. She requested additional time and funding to continue her search, or an extended timeframe within which the evaluation could be completed. However, the court stated that it was concerned with avoiding further delay and appointed Dr. Bruce Seidner, one of the state's recommended experts, on August 1, 2008. After evaluating Hugueley, Dr. Seidner concluded that he was competent to waive post-conviction review. Approximately two weeks before a November 14, 2008 competency hearing, Gleason filed a renewed motion for expert assistance, again requesting funding for brain-imaging scans and expert evaluations from three doctors.

The court again denied the motion.  The court then held an evidentiary hearing where Dr. Seidner testified and was cross-examined.  After the hearing, Hugueley was given the opportunity to present additional evidence regarding his competency, and Gleason supplemented the record with a report that questioned the adequacy and reliability of Dr. Seidner's evaluation.  On January 8, 2009, the court concluded that Hugueley was competent and granted his request to withdraw his post-conviction petition.

Although Hugueley had made the decision to voluntarily withdraw his post-conviction petition, he nonetheless appealed the post-conviction court's decision to the Tennessee Court of Criminal Appeals.  While his appeal was pending, Hugueley also filed an affidavit in that court stating that he wished to revoke the withdrawal of his petition and to resume proceedings. However, the Tennessee Court of Criminal Appeals noted that the affidavit—filed on August 10, 2009—was filed more than eight months after the withdrawal was granted, after the requisite thirty-day period necessary for a Tennessee court to reinstate the post-conviction petition.  *See Pike v. State*, 164 S.W.3d 257, 267 (Tenn. 2005).  It therefore affirmed the trial court's decision. *Hugueley v. State*, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824 (Tenn. Crim. App. June 8, 2011) ("*Hugueley II*").

## B.  Federal Habeas Proceedings

In 2009, Hugueley filed a 28 U.S.C. § 2254 habeas petition in federal court, which forms the basis of this appeal.  In the petition, he raised twelve separate claims for relief, all of which the district court rejected.  We ultimately granted Hugueley a certificate of appealability on one issue: whether Hugueley's trial counsel was ineffective.  The district court had rejected this claim because it concluded that Hugueley had procedurally defaulted it by withdrawing his state post-conviction petition.  *See Hugueley v. Westbrooks*, 2017 WL 3325008, at *67 (W.D. Tenn. Aug. 3, 2017) ("*Hugueley III*").

The gist of Hugueley's claim is that his trial counsel failed to adequately develop evidence of his alleged incompetency, which resulted in him improperly standing trial and receiving the death penalty.  Both experts who examined Hugueley before trial had concluded that while he had suffered from a long history of psychiatric disorders, he could still understand the nature of judicial proceedings and was therefore competent to stand trial.  However, in 2013,

as part of his federal habeas proceedings, Hugueley had MRI scans conducted on his brain. Although Hugueley had CT scans taken in 2003, which did not reveal any abnormalities, two new experts—Doctors George Woods and Siddhartha Nadkarni—concluded from the 2013 MRI that Hugueley's brain was not fully developed, suggesting that he is not able to correctly perceive reality or respond rationally. Based on four separate examinations of Hugueley (in 2001, 2011, 2013, and 2014), the MRI scans, and documents from Hugueley's prior evaluations, Dr. Woods expressly concluded that Hugueley had been "incompetent to stand trial in his capital case." Dr. Nadkarni—who did not evaluate Hugueley but had access to the MRI scans and prior evaluations—concluded that Hugueley currently did "not meet either the federal or state competence standard." Dr. Nadkarni did not offer an opinion as to Hugueley's competence during his 2003 trial.[2]

Hugueley argues that these new evaluations demonstrate that his counsel at trial was wholly ineffective for failing to fully develop evidence of his alleged incompetency. More specifically, Hugueley separates his claim into two categories: (1) that his trial counsel was ineffective for failing to fully investigate and litigate his competency to stand trial; and (2) that his trial counsel was ineffective for failing to investigate his competency when he committed his prior murders, each of which was an aggravating factor that resulted in his capital sentence. In short, Hugueley asserts that had his trial lawyers conducted a full investigation into his competency, there would have been a reasonable probability that either he would not have stood trial, the jury would not have convicted him, or he would not have been sentenced to death.

Tennessee responds by arguing that because Hugueley made a competent withdrawal of his post-conviction petition, he never fully developed any of these claims before the Tennessee courts and has procedurally defaulted them. *See* Tenn. Sup. Ct. R. 28; *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas

---

[2]During the pendency of Hugueley's federal habeas proceedings, he also filed a petition for a writ of error coram nobis in state court, arguing that the new mental-health conclusions by Doctors Nadkarni and Woods meant that Hugueley was incompetent to stand trial and that he was incompetent to withdraw his state post-conviction proceedings. The state trial court denied the petition as meritless, and the Tennessee Court of Criminal Appeals affirmed. *Hugueley v. State*, No. W2016-01428-CCA-R3-ECN, 2017 WL 2805204 (Tenn. Crim. App. June 28, 2017).

review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.").

Hugueley counters that his procedural default was invalid, or in the alternative, that it should be excused.

### III.  LEGAL OVERVIEW

In reviewing the denial of a habeas petition, we review a district court's legal determinations and mixed questions of law and fact de novo while factual determinations are reviewed for clear error.  *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013).

Generally, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *see also Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017) ("Federal habeas courts reviewing convictions from state courts will not consider claims that a state court refused to hear based on an adequate and independent state procedural ground.").  This rule was "designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism." *Martinez*, 566 U.S. at 9.

It is undisputed that Hugueley's withdrawal of his state post-conviction petition resulted in a failure to present his ineffective-assistance-of-trial-counsel claim for review on the merits by the Tennessee courts.  The federal habeas court in the current proceeding thus concluded that the claim had been procedurally defaulted and dismissed it.  *Hugueley III*, 2017 WL 3325008 at *67. However, the doctrine of procedural default is not without exceptions.  "A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S. at 10.  Additionally, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id*. at 9.

On appeal, Hugueley argues his waiver of his claim was not a valid procedural default and that, even if the default was valid, it should be excused.  First, he contends that the state court's procedures in determining his competency to withdraw his post-conviction petition violated due-process requirements because they failed to provide him with sufficient time or resources to adequately demonstrate his incompetency, rendering the default of his claims invalid.  Second, he contends that even if the procedural default was valid, his post-conviction counsel was ineffective, thereby creating cause and prejudice to excuse the default.  For the following reasons, we reject both arguments and affirm the district court's denial of Hugueley's habeas petition.

## IV.  DISCUSSION

### A.  Process of State-Court Competency Determination under *Panetti v. Quarterman*

Hugueley claims that his procedural default is invalid because the state post-conviction court's procedures in determining his competency to withdraw his petition violated due process. In support, Hugueley relies on *Panetti v. Quarterman*, which held that once a death-row petitioner who is alleging that he is too incompetent to be executed has made a substantial showing of his incompetency, he is entitled to "an adequate means by which to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court." 551 U.S. 930, 948 (2007).  In particular, the petitioner is entitled to a "fair hearing," an "opportunity to be heard," and a "determination of sanity" that has not "been made *solely* on the basis of the examinations performed by state-appointed psychiatrists."  *Id*. at 949 (citations omitted).

Hugueley argues that the post-conviction court's actions in evaluating his competency did not conform to these procedural requirements.  He takes issue with the court's refusal to grant him additional time or funding to secure another expert after Dr. Brown was disqualified, which he claims resulted in his inability to "make an adequate response to evidence solicited by the state" and prevented him from submitting "psychiatric evidence as a counterweight to the report filed by the court-appointed expert."  *Id*. at 952.  He also objects to the court's denial of his request for funding to obtain brain scans, claiming that had the motion been granted, the scans would have revealed—as he contends that his 2013 MRIs do now—that he was incompetent.

But Hugueley's arguments are unavailing for several reasons. *Panetti*, and its predecessor case, *Ford v. Wainwright*, 477 U.S. 399 (1986), each considered a death-row petitioner's claim that he would be *ineligible for execution* because of his incompetency, not a claim that he was incompetent to waive state post-conviction review. This is a distinction with constitutional implications. "The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." *Id*. at 410; *see also Thompson v. Bell*, 580 F.3d 423, 435 (6th Cir. 2009) (noting that the Eighth Amendment requires "that a prisoner must be able to understand the impending execution and the reason for it"). The procedural safeguards mandated by *Panetti* and *Ford* ensure that a petitioner will not be executed if he cannot fully understand the reasons behind his execution. Thus, we have held that if there is "a genuine issue about [a petitioner's] competency" *to understand his execution*, then an evidentiary hearing is "warrant[ed]." *Thompson*, 580 F.3d at 436.

A similar constitutional concern does not animate a claim that the petitioner is incompetent to waive state post-conviction review. "State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings and serve a different and more limited purpose than either the trial or appeal." *Murray v. Giarratano*, 492 U.S. 1, 10 (1989) (plurality opinion); *see also Lackawanna Cty. Dist. Att'y v. Coss*, 532 U.S. 394, 402 (2001) (noting that each state has created procedures for post-conviction review, "even though there is no constitutional mandate that they do so"). States are under "no obligation" to establish procedures for evaluating collateral attacks on a conviction because post-conviction proceedings are "not part of the criminal proceeding itself" but are instead "civil in nature." *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). It therefore follows that states are under no obligation to provide a petitioner with his preferred procedural framework when evaluating his competency to withdraw his post-conviction review.[3]

---

[3]This conclusion does not preclude Hugueley from raising the issue of his competency to be executed at a later time, because "[a] competency claim under *Ford* . . . does not become ripe until an execution date is set" and "the limitation on second-or-successive habeas petitions does not apply, so long as the second-in-time petition is filed as soon as it becomes ripe." *In re Campbell*, 874 F.3d 454, 466 (6th Cir. 2017) (per curiam). However, it does foreclose Hugueley's argument that the state court's dismissal of his post-conviction petition was not in accordance with due process.

Importantly, even if *Panetti* did apply to Hugueley's situation, there is no indication that the post-conviction court failed to comply with its due-process requirements. Assuming that Hugueley has made a substantial showing of his incompetence, due process required only that he receive a fair hearing on the matter and an opportunity to be heard. *See Panetti*, 551 U.S. at 949; *Bedford v. Bobby*, 645 F.3d 372, 380 (6th Cir. 2011) (per curiam). As noted earlier, the post-conviction court held an evidentiary hearing to determine Hugueley's competency, where Dr. Seidner testified and was cross-examined. Indeed, the court noted that at the hearing, Dr. Seidner's conclusions and credentials were "vigorously challenged" and that he was "questioned at length about his testing methodology." Hugueley also had the opportunity to submit additional evidence after the hearing, and he supplemented the record with arguments for why Dr. Seidner's evaluation should not be relied upon.

Nevertheless, Hugueley argues that the court relied only on the opinion of Dr. Seidner—the expert recommended by the state—and thus contravened *Panetti*'s prohibition against competency determinations "made *solely* on the basis of the examinations performed by state-appointed psychiatrists." *Panetti*, 551 U.S. at 949. However, when compared to the underlying situation from *Ford v. Wainwright* that prompted this rule, Hugueley's attempts to analogize fall short. In *Ford*, the Supreme Court held that Florida's procedure for evaluating the competency of a condemned inmate violated due process. Under a state statute, the Governor of Florida could appoint of a panel of three psychiatrists who would together evaluate the inmate at a single meeting for thirty minutes. *Ford*, 477 U.S. at 403–04. Each doctor then filed a separate report with the Governor, who would decide whether the execution would proceed by either signing or refusing to sign the inmate's death warrant. *Id*. at 404. The statute did not require a hearing of any kind, any presentation of evidence from the prisoner, or any opportunity for the prisoner to respond to the state-appointed psychiatrists' conclusions. In short, there was no requirement that the Governor "consider materials submitted by the prisoner," thus depriving the prisoner of "an opportunity to be heard." *Id*. at 424 (Powell, J., concurring) (internal quotation marks and citations omitted). The procedure therefore necessarily resulted in an evaluation of materials that had *only* been prepared by the state.

In contrast to the situation in *Ford*, Hugueley was able to submit several pieces of evidence for the post-conviction court's consideration. He submitted his mental-health records, and his social history and mitigation reports—which had been prepared for but were not submitted at trial. He also submitted new affidavits from the two doctors who had examined him previously. The court also provided Hugueley with ample opportunity to obtain an evaluation from his preferred expert, Dr. Brown. Indeed, Dr. Brown was appointed in January of 2008 and had over six months to evaluate Hugueley but had not even begun to do so by the time he was disqualified. *See Hugueley II*, 2011 WL 2361824, at *26. Hugueley argues that it was the court's manner of setting short deadlines—requiring Hugueley's counsel to request and receive several extensions on Dr. Brown's behalf—that prevented Dr. Brown from evaluating him. But Dr. Hutson, the state's preferred expert, was subject to the same procedures and was able to finish his evaluation on time (although he was later disqualified for other reasons). Even after Dr. Brown was disqualified, Hugueley was given an opportunity to secure another expert, but did not do so. Put simply, Hugueley was not subject to a process that was unfair to him in any material way. Any deficiency that ultimately resulted in Dr. Seidner being the only one to evaluate Hugueley cannot be attributed to a due-process violation by the post-conviction court. Nothing in *Panetti* and *Ford* adverts to the conclusion that a petitioner is entitled to the procedure of his choice, or an expert of his choice in making the competency determination. As such, we hold those cases cannot be a basis to invalidate Hugueley's withdrawal of his post-conviction petition.

### B. Excuse of Procedural Default Under *Martinez v. Ryan*

Hugueley argues, in the alternative, that even if the ruling of procedural default was valid, his procedural default of his ineffective-assistance-of-trial-counsel claim should be excused. In support, he claims that his post-conviction counsel was ineffective in developing evidence of his alleged incompetency, thereby causing the court to make an incorrect determination that he was able to voluntarily withdraw his post-conviction review.

Hugueley's argument relies on *Martinez v. Ryan*, which held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that

proceeding was ineffective." 566 U.S. at 17. Although the situation in *Martinez* involved a state procedural framework that required prisoners to raise an ineffective-assistance-of-trial-counsel claim for the first time on collateral review, the Supreme Court has since clarified that this exception also applies where a state's "procedural framework, by reason of its design and operation, makes it unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal[.]" *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). For all intents and purposes, *Martinez* created a very "narrow exception," to the procedural-default bar, *Martinez*, 566 U.S. at 9, and "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." *Davila*, 137 S. Ct. at 2062. We have held that because Tennessee courts advise prisoners to file ineffective-assistance-of-trial-counsel claims for the first time in post-conviction proceedings, defendants in the state are "highly unlikely to have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal," and thus the *Martinez* exception applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014). However, to succeed on his claim, Hugueley must still demonstrate that the ineffectiveness of his post-conviction counsel was the "cause" of his default, and that his underlying ineffective-assistance-of-trial-counsel claim was "substantial." *Trevino*, 569 U.S. at 423 (citing *Martinez*, 566 U.S. at 17).

Hugueley argues that Gleason's performance was deficient and was therefore the "cause" of his default because she failed to take certain actions to develop evidence of his alleged incompetency. In support, he notes that several of Gleason's motions for expert assistance were denied because she failed to abide by a Tennessee Supreme Court rule that required counsel to make "every effort" to obtain experts located within 150 miles of the court. *See Hugueley II*, 2011 WL 2361824, at *22. Each of Gleason's proposed neuropsychological, psychopharmacology, and psychiatric experts was located outside of the geographic boundaries set out by the rule and so the post-conviction court denied funding for them. Hugueley also objects to Gleason's inability to secure funding for brain-imaging scans. Although Gleason

ultimately filed two motions requesting such funding (both of which were denied), Hugueley suggests that Gleason should have pushed the issue further.

We hold that Gleason's performance was not a "cause" of Hugueley's default because she properly raised a claim of ineffective assistance of trial counsel in the state collateral proceedings. *Martinez* and the cases that follow it indicate that the Supreme Court's rationale in creating the exception was the concern that deficient (or nonexistent) post-conviction counsel would fail to ever *raise* a prisoner's ineffective-assistance-of-trial-counsel claim, not a concern that the claim would be raised but ultimately be underdeveloped. Put another way, post-conviction counsel's failure to take all possible steps to fully develop a claim cannot be the "cause" of a default as long as counsel properly raised the claim and made a good-faith effort in presenting it.

Let us start with the basics: The nature of an ineffective-assistance-of-trial-counsel claim is that it "normally requires a different attorney, because it often 'depend[s] on evidence outside the trial record[.]'" *Trevino*, 569 U.S. at 422 (citation omitted). Such a claim "generally cannot be presented until *after* the termination of direct appeal" and thus "*necessarily* must be heard in collateral proceedings." *Davila*, 137 S. Ct. at 2068. Yet there is no constitutional right to counsel in collateral proceedings, and so prisoners seeking to allege a violation of their fundamental right to counsel at trial are often unrepresented. *See ibid.* This creates a situation in which a prisoner who believes that he was provided inadequate counsel at trial, but who has no counsel (or ineffective counsel) in collateral proceedings, might "fail[] to raise" the claim, thereby "depriv[ing] a defendant of any review of that claim at all." *Trevino*, 569 U.S. at 423; *see also Martinez*, 566 U.S. at 7 (noting that Martinez was denied relief in state court "because he failed to raise his claims in the first collateral proceeding"). Not excusing a procedural default even though the failure to raise it was not attributable to the petitioner would render the possible constitutional violation permanently unremedied. Thus, the problem that *Martinez* identified (and hoped to remedy) was that "it would be inequitable to refuse to hear a defaulted claim of ineffective assistance of trial counsel . . . where the prisoner might lack the assistance of counsel *in raising it.*" *Davila*, 137 S. Ct. at 2068 (emphasis added); *see also Trevino*, 569 U.S. at

429 (noting that it was concerned with prisoners having a "meaningful opportunity to raise a claim of ineffective assistance of trial counsel").

*Martinez* and its progeny clearly establish that post-conviction counsel's failure to raise a substantial claim of ineffective-assistance-of-trial-counsel constitutes deficient performance. However, because there is no right to counsel in post-conviction proceedings, a showing of deficient performance for failure to take certain actions *after* the claim has been properly raised is extremely difficult. A counsel's performance is deficient only if she performed at a level below that of "the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Since a petitioner has no Sixth Amendment right to counsel in a post-conviction proceeding, it therefore follows that counsel cannot be ineffective for not taking all possible steps to fully develop the claim that the petitioner wishes she had.

Here, it is undisputed that Gleason vigorously raised Hugueley's ineffective-assistance-of-trial-counsel claim, including how trial counsel failed to properly litigate his competency to stand trial or to waive the presentation of mitigating evidence. Starting in January 2007, Gleason also spent several months exploring avenues for evidence in support of the claim, including filing motions for experts and submitting Hugueley's mental-health reports into the record. When Hugueley first expressed a desire to withdraw his petition, Gleason also independently raised her own concerns about his competency, and successfully demonstrated that a genuine issue existed on that point. This resulted in the post-conviction court's careful review of the issue, and its appointment of Dr. Seidner. Throughout the process, Gleason also repeatedly sought to obtain funding for expert services and brain-imaging scans on behalf of Hugueley and apparently made several attempts to arrange Dr. Brown's evaluation of him.

Even if Gleason had filed repetitive motions for additional expert assistance or brain-imaging scans, there was no indication that the post-conviction court would have granted them. And even if the motions were granted, there was no indication that additional experts or new brain scans would have so obviously revealed Hugueley's alleged incompetency that the post-conviction court's conclusion to the contrary was clearly incorrect. *See Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012) ("A state-court determination of competence is a factual finding, to which deference must be paid."); 28 U.S.C. § 2254(e)(1) ("[A] determination of a

factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Every mental-health expert who had evaluated Hugueley up to that point had determined that he was competent, and upon granting Hugueley's motion to withdraw his petition, the post-conviction court remarked that "[i]t seems clear from petitioner's statements that he not only understands the ramifications of the choice he is making; but, clearly understands the legal process involved in exercising such a choice." The court further stated that Hugueley "appears particularly adept at manipulating the system to suit his purpose. Thus, his choices appear both cogent and rational." Put simply, even if Gleason had pursued all possible avenues to further develop evidence of Hugueley's alleged incompetency, it is far from certain that any of the additional steps that could have been taken would have resulted in a different ruling from the post-conviction court.

The "equitable judgment" animating *Martinez* was that a state could "deliberately choos[e] to move trial-ineffectiveness claims outside of the direct-appeal process, where counsel is constitutionally guaranteed,'" into a proceeding where counsel was not guaranteed, thereby "significantly diminish[ing] prisoners' ability to file such claims." *Martinez*, 566 U.S. at 13. Such a concern is not present in situations such as Hugueley's, where the claim is fully raised, but defaulted due to the petitioner's own choices. Despite Gleason's efforts in raising and attempting to present Hugueley's ineffective-assistance-of-trial-counsel claim, the post-conviction court was prevented from evaluating the claim because Hugueley chose to withdraw his petition. Therefore, *Martinez* cannot provide a basis to excuse the default.[4]

---

[4]On this appeal, Hugueley raises a new theory of relief that was never raised before: that his trial attorneys were ineffective for failing to investigate whether he was competent when he was convicted of his prior violent felonies, each of which was an aggravating factor that resulted in him receiving the death penalty. Hugueley argues that the failure to raise this argument demonstrates a cause to excuse his procedural default. However, even if this *theory of relief* was not raised in the state post-conviction proceedings, the vehicle through which Hugueley could obtain relief through the theory—his ineffective-assistance-of-trial-counsel claim—unquestionably was. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992); *see also Leonor v. Provident Life & Accident Co.*, 790 F.3d 682, 687 (6th Cir. 2015) ("We have recognized a distinction between failing to properly raise a claim before the district court and failing to make an argument in support of that claim."). Hugueley's post-conviction counsel could not have been ineffective by not raising one theory of relief that could have possibly underpinned his ineffective-assistance-of-trial-counsel claim. Holding that Hugueley's post-conviction counsel was ineffective on such a shaky basis would permit future petitioners seeking relief under

* * *

For the foregoing reasons, the denial of Hugueley's habeas petition is AFFIRMED.

---

*Martinez* to take multiple bites at the apple, as they could simply argue that their post-conviction counsel did not raise one (of possibly many) theories of relief in support of a traditional ineffective-assistance-of-trial-counsel claim.